# AFFIDAVIT OF POSTAL INSPECTOR

# GINA GENTILUOMO

# DATED MARCH 26, 2019

# ("MARCH 26, 2019 GENTILUOMO AFFIDAVIT")

**19-mj-5054-JGD; 19-mj-5055-JGD;**
**19-mj-5056-JGD; 19-mj-5057-JGD;**
**19-mj-5058-JGD; 19-mj-5059-JGD**

## AFFIDAVIT OF U.S. POSTAL INSPECTOR GINA GENTILUOMO

I, Gina Gentiluomo, being duly sworn, state the following:

1.     I am a United States Postal Inspector currently assigned to the Boston Division Headquarters of the United States Postal Inspection Service ("USPIS"). I have been employed as a Postal Inspector since April 2017. I am currently assigned to the External Crimes Team, which includes responsibility for Prohibited Mail-Narcotics investigations. Prior to becoming a Postal Inspector, I was employed initially as an intern then as an Investigative Support Assistant with the United States Secret Service ("Secret Service") beginning in 2007.

2.     As a Postal Inspector, I am a law enforcement officer of the United States pursuant to 18 U.S.C. § 3061 and am authorized to investigate, among other things, offenses involving the use of the mails. I am also a federal law enforcement officer authorized to apply for federal search warrants pursuant to Rule 41 of the Federal Rules of Criminal Procedure.

3.     I have received training in the areas of search and seizure, controlled substances investigations, and criminal law. I have also received training by the USPIS in the investigation of controlled substances and proceeds/payments for controlled substances being transported through the United States mails. I have received specialized training in the following: (1) Basic Prohibited Mailings Narcotics; (2) Dark Net and Crypto-currencies in Criminal Activities; and (3) Crime Scene Processing.

4.     As a Postal Inspector assigned to the External Crimes Team, my duties and responsibilities include, but are not limited to, the investigation of the illegal shipment of controlled substances and the proceeds from the sale of controlled substances, as well as the

laundering of drug proceeds via the United States Postal Service ("USPS"). I have participated in several investigations involving the transportation of controlled substances or proceeds from the sales of (or payments for) controlled substances through the USPS, money laundering, and related crimes. Many of these investigations have had national or international connections and many required me to work closely and share information and intelligence with members of other law enforcement agencies, including the Federal Bureau of Investigation ("FBI"), the Homeland Security Investigations ("HSI"), and the Massachusetts State Police ("MSP"). I have participated in the debriefing of various individuals who either participated in, or had personal knowledge concerning, the sale and distribution of narcotics, money laundering, and related crimes occurring in Massachusetts and nationally.

## PURPOSE OF AFFIDAVIT

5.     I am submitting this affidavit in support of applications for search warrants for the following locations:

    a.     1749 Central St., Suite 3, Stoughton, Massachusetts which, as will be discussed, is where I believe Binh LE operates a drug manufacturing, processing and distribution business (hereinafter "the Stoughton Location"). A complete description of the Stoughton Location and photographs are set forth in Attachment A-1, which is attached hereto and incorporated herein.

    b.     285 Menlo Street, Brockton, Massachusetts which, as will be discussed, is where I believe LE resides and where LE has received both domestic and international parcels that I believe were being used in furtherance of his drug manufacturing, processing, and distribution (hereinafter "the LE Residence"). A complete description of the LE Residence and photographs are set forth in Attachment A-2, which is attached hereto and incorporated herein.

In this Affidavit, I will refer to the Stoughton Location and the LE Residence collectively as "the Target Locations."

2

6.      I am also submitting this affidavit in support of applications for search warrants to

seize and search packages and/or padded envelopes located in the following four mailboxes:

      a.      Private Mailbox #162 located at 319 Centre Avenue in Rockland, Massachusetts ("the Rockland CMRA Mailbox"), which is a Commercial Mail Receiving Agency ("CMRA") mailbox located at The UPS Store. As will be discussed, I believe the Rockland CMRA Mailbox is being used by LE to receive parcels addressed to "Dajour Cox" in furtherance of the manufacture and distribution of controlled substances. A complete description of the Rockland CMRA Mailbox is set forth in Attachment A-3, which is attached hereto and incorporated herein.

      b.      Private Mailbox #234 located at 18 Washington Street in Canton, Massachusetts ("the Canton CMRA Mailbox"), which is a CMRA mailbox being rented to LE, doing business as BL Productions, at Postal Center USA. As will be discussed, I believe that the Canton CMRA Mailbox is being used by LE to receive parcels in furtherance of the manufacture and distribution of controlled substances. A complete description of the Canton CMRA Mailbox is set forth in Attachment A-4 which is attached hereto and incorporated herein.

      c.      Private Mailbox #384 located at 20 Roche Brother's Way, Unit 6, in North Easton, Massachusetts ("the North Easton CMRA Mailbox") which is a CMRA mailbox being rented to Duane Freeman at The UPS Store. As will be discussed, I believe that the North Easton CMRA Mailbox is being used by LE to receive parcels addressed to Duane Freeman in furtherance of the manufacture and distribution of controlled substances. A complete description of the North Easton CMRA Mailbox is set forth in Attachment A-5 which is attached hereto and incorporated herein.

      d.      P.O. Box 604, 300 Main Street, North Easton, MA 02356 ("the North Easton Post Office Box"), which is a Post Office Box, located at the North Easton, Massachusetts Post Office, 300 Main St., North Easton, MA 02356, being rented to Duane Freeman. As will be discussed, I believe that the North Easton Post Office Box is being used by LE to receive parcels addressed to Duane Freeman in furtherance of the manufacture and distribution of controlled substances. A complete description of the North Easton Post Office Box is set forth in Attachment A-6 which is attached hereto and incorporated herein.

In this Affidavit, I will refer to the Rockland CMRA Mailbox, the Canton CMRA Mailbox, the

North Easton CMRA Mailbox, and the North Easton Post Office Box collectively as "the Target

Mailboxes."

7.     I am seeking these warrants in furtherance of an ongoing criminal investigation into the activities of several individuals, both known and unknown, including Binh Thanh Le ("LE"), concerning violations of federal criminal laws including, but not limited to, the distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1); use of a communications facility in the commission of controlled substances trafficking offenses, in violation of 21 U.S.C. § 843(b); conspiracy to commit drug trafficking offenses, in violation of 21 U.S.C. § 846; and money laundering offenses, in violation of 18 U.S.C. §§ 1956, 1957 (collectively, "the Target Offenses").

8.     I have personally participated in this investigation since June 2018.  I am familiar with the facts and circumstances of this investigation based upon:  (a) my personal knowledge and involvement in this investigation; (b) my review of business records from various sources, including the USPS; (c) information provided to me orally and in writing by other law enforcement agencies participating in this and related investigations; and (d) my experience and training as a criminal investigator.  I am also familiar with the facts and circumstances of this investigation from oral and/or written reports by agents from HSI, Customs and Border Protection ("CBP"), and members of the MSP who have assisted in this investigation.

9.     Because this affidavit is being submitted for the limited purpose of obtaining search warrants for the Target Locations and the Target Mailboxes, I have not included each and every fact known to me and other law enforcement officers involved in this investigation. Rather, I have included only those facts that I believe are necessary to establish probable cause for the issuance of the requested search warrants.  Facts not set forth herein are not being relied upon in reaching my conclusion that there is probable cause to support the issuance of the

requested search warrants. Nor do I request that this Court rely on any facts not set forth herein in reviewing this application.

## GENERAL BACKGROUND CONCERNING THE SHIPMENT OF DRUGS THROUGH THE UNITED STATES MAILS

10.     Experience and drug trafficking intelligence information gathered by the USPIS have demonstrated that USPS Priority Mail Express and Priority Mail are frequently used by drug traffickers for shipping drugs and the proceeds from drug sales. Use of Priority Mail Express and Priority Mail are favored because of the speed, reliability, free telephone and Internet package tracking service, as well as the perceived minimal chance of detection.

11.     I know, based on my training and experience, and my discussions with more experienced Postal Inspectors, that individuals mailing drugs or payments from drug sales will often address their parcels using false names and/or sender addresses to avoid detection by law enforcement. This is in contrast to individuals engaged in lawful transactions or correspondences, who put a legitimate return address on a parcel to ensure the return of the parcel in the event of non-delivery.

12.     Combined, these factors make it appealing for narcotics trafficking organizations to utilize legal and legitimate shipping methods such as the USPS to transport their product and/or proceeds because it is a relatively anonymous, secure, and fast method of transportation.

## GENERAL BACKGROUND CONCERNING DARK NETWORK MARKETS

13.     Based on my training and experience, and my discussions with more experienced Postal Inspectors, I know that individuals involved in the trafficking of illicit drugs are increasingly using Dark Network Markets ("DNMs") to distribute and purchase narcotics and materials used to manufacture narcotics. Some common examples of these DNMs are *Dream Market*, *Wallstreet Market*, and *The Majestic Gardens*. The "Dark Network" refers to any

5

portion of the Internet that can be accessed only with specific software, configurations, or authorization. The most common method of accessing the Dark Network is via free software called "*The Onion Router*," otherwise known as "Tor." People who access the Dark Network use a series of sites that anonymize their internet traffic, thereby making it difficult for law enforcement to track them via an Internal Protocol ("IP") address. To further criminal activities, those distributing illicit goods, including narcotics, have established websites on DNMs on which they advertise and sell illicit materials.

14.     Based on my training and experience, and my discussions with more experienced Postal Inspectors, I know that individuals involved in the trafficking of illicit drugs related to DNM illegal activity often take advantage of the enhanced anonymity of crypto-currency, such as Bitcoin.

15.     Based on my training and experience, and my discussions with more experienced Postal Inspectors, I know that individuals store information about their Bitcoin in a Bitcoin virtual "wallet," which acts as a Bitcoin equivalent of a bank account. Bitcoin wallets have a private key and a public key, the latter of which is commonly known as the wallet address. Bitcoin wallets are electronic in nature and may be stored on mobile devices, external or removable media, or computers. In addition, individuals conducting business with Bitcoins can backup wallets to paper printouts, which would contain information to restore the wallet into an electronic form (otherwise known as cold storage). Passwords for access to electronic wallets are typically complex and often written down or saved in an accessible manner on paper or on some electronic device. The keys are a series of alphanumeric characters that, when used together, will open a wallet and allow funds to be sent or received and can be provided to individuals who wish to consummate transactions with Bitcoin. A single user can create

6

hundreds of unique Bitcoin addresses attached to a single Bitcoin wallet.  Bitcoin is

pseudonymous, meaning that the digital currency is not tied to an identifiable real-world entity

but rather to a Bitcoin address.  Owners of a Bitcoin address are not explicitly identified and new

addresses can be generated for every new transaction to increase anonymity.

      16.     Based on my training and experience, and my discussions with more experienced

Postal Inspectors, I know that after a transaction is complete and a DNM vendor receives the

crypto-currency, the vendor has various options of what to do with the crypto-currency.  For

example, the vendor can leave the crypto-currency in the digital wallet linked to the DNM where

the sale occurred (*e.g.*, *Dream Market*) he can transfer it from that wallet to another digital

wallet, application, or software used for holding crypto-currency, or he can transfer the crypto-

currency to a peer or an exchange for the conversion of the crypto-currency to fiat currency,

which is tangible currency, such as U.S. Dollars.

      17.     Based on my training and experience, and my discussions with more experienced

Postal Inspectors, I know that DNM vendors often need to exchange the crypto-currency (*e.g.*,

Bitcoin) proceeds of their illicit activity into fiat currency.  Based on my training and experience,

and my discussions with more experienced Postal Inspectors, I know that the purchase and sale

of Bitcoin can be conducted either through an online exchange where the transaction occurs with

the exchange (*i.e.*, *Coinbase.com*), or through a peer-to-peer transaction that does not use an

established exchanging service as an intermediary (*i.e., Localbitcoins.com*).  These peer-to-peer

exchanging services are marketplaces where users can buy and sell items, including Bitcoins, to

and from each other.  Users, called traders, create advertisements with the price and payment

method they want to offer.  Other users can browse the website for trade advertisements and

search for a payment method they prefer.  Peer-to-peer transactions can be conducted

anonymously from any location with an internet connection, or by individuals meeting in person where the seller sends Bitcoin from their digital Bitcoin wallet directly to a buyer's Bitcoin wallet in exchange for a predetermined amount of fiat currency or other asset (*i.e.*, prepaid gift cards, reloadable debit cards, jewelry, etc.).

18.     Based on my training and experience, and my discussions with more experienced Postal Inspectors, I know individuals conducting business in this manner must use a computer or other electronic device, such as a smartphone, tablet, or computer to conduct transactions involving Bitcoin.   Such devices are also necessary to access and conduct transactions on a DNM.

19.     Based on my training and experience, and my discussions with more experienced Postal Inspectors, I also know that DNM vendors often use third-party postage services, which allow their customers to purchase postage using crypto-currency, to add additional layers of anonymity to their transactions.

## INVESTIGATION BACKGROUND AND OVERVIEW

20.     Since June 2018, I have been conducting an investigation of LE and others, who I believe are engaged in the illicit manufacture and distribution of controlled substances via the internet.  Based upon my investigation to date, I believe that LE, with the assistance of others, is: (1) receiving wholesale quantities and/or raw materials of controlled substances at various locations in southern Massachusetts, including the Target Mailboxes; (2) processing and manufacturing those controlled substances at the Stoughton Location (1749 Central Street, Suite 3, Stoughton, Massachusetts); (3) receiving orders for those drugs (including, but not limited to, MDMA, Ketamine, and Xanax) via the internet using the vendor name *EastSideHigh*; (4) filling those orders at the Stoughton Location; and (5) distributing those drugs via USPS.

21.     As will be discussed herein, law enforcement officers have, on multiple occasions, recovered trash discarded by LE in dumpsters located at the Stoughton Location that are consistent with the processing, manufacture, and distribution of controlled substances at the Stoughton Location.  Agents have also recovered empty packages and padded envelopes that were originally shipped to various Target Mailboxes.  Agents have also recovered personal items associated with LE in this trash.

22.     Additionally, as discussed herein, law enforcement agents have seized several parcels containing raw materials used in the manufacture of controlled substances that were addressed to the Target Mailboxes.  USPS records further indicate that LE and others have received packages at the Target Mailboxes from addresses associated with the shipment of raw materials and/or equipment used in the manufacture of controlled substances.  Surveillance officers have observed LE traveling to multiple CMRAs on the same day to collect parcels at the Target Mailboxes and then transporting those parcels to the Stoughton Location, where LE and others are believed to manufacture and process controlled substances for distribution.

23.     Additionally, surveillance observations and data from judicially-authorized GPS devices attached to vehicles operated by LE establish that LE, upon leaving the Stoughton Location, has traveled to various post offices and placed numerous envelopes in blue collection boxes at those post offices.  On two occasions, law enforcement officers subsequently recovered envelopes mailed from these post offices that were addressed to an undercover name and address that I had used to order controlled substances from the Dark Net vendor *EastSideHigh*.  These envelopes contained controlled substances.  USPS records further reflect that other parcels bearing the same return address as the parcels addressed to my undercover name and address were mailed to various recipients throughout the United States.

9

**LE**

24.     According to records from the Massachusetts Registry of Motor Vehicles ("RMV"), LE currently lives at the LE Residence (285 Menlo Street, Brockton, Massachusetts). Surveillance officers have observed LE going in and out of the LE Residence on a number of occasions.  Surveillance officers have also observed vehicles operated by LE parked at the LE Residence during overnight hours, and data from judicially-authorized GPS devices attached to vehicles owned and operated by LE similarly indicate that the vehicles have regularly been at the LE Residence overnight, thus leading me to believe that LE sleeps and resides at the LE Residence.

25.     I conducted an internet query of LE's information using the online database known as CLEAR, which is an investigative platform that searches proprietary sources and public records to obtain information on individuals and businesses.  According to the CLEAR database, LE resided at 1318 Summit Dr., Apt. 131A in Bridgewater, Massachusetts prior to residing at the LE Residence.

26.     LE is renting private mailboxes at several CMRAs and is receiving mail at these locations.  According to records from the UPS Store located at 95 Washington St., Ste. 104, in Canton, Massachusetts, LE has been renting private mailbox #331 since approximately August 22, 2018.

27.     According to records from the Postal Center USA located at 18 Washington Street in Canton, Massachusetts, LE is renting the Canton CMRA Mailbox.  This CMRA is located less than one-half mile from the UPS Store in Canton, Massachusetts.  Based upon my training and experience, and through my discussions with more experienced Postal Inspectors, I am aware

that individuals engaged in illicit activities using the mail often rent private mailboxes at various locations in an attempt to hide their conduct from law enforcement.

28.     Records from the Postal Center USA located at 18 Washington Street in Canton, Massachusetts, indicate that LE, using the name of a business "BL Productions," has been renting the Canton CMRA Mailbox since approximately November 13, 2018.

29.     According to the website maintained by the Massachusetts Secretary of State, LE established a Domestic Limited Liability Company (LLC) in the name of "BL Productions" on August 24, 2018.  I believe that the "BL" in BL Productions represents the initials for LE's name (Binh Le).  The website indicates that LE listed the Stoughton Location (1749 Central St., Ste. 3, Stoughton, MA 02072) as the address where the records for BL Productions would be maintained.

### Trash Recovered from 1749 Central Street Supports My Belief that LE is Using the Stoughton Location to Engage in Drug Manufacturing and Drug Trafficking

30.     On numerous occasions, throughout the course of this investigation, surveillance officers have observed LE and others going in and out of the Stoughton Location.  During the investigation, surveillance officers have also recovered trash discarded by LE at 1749 Central Street in Stoughton, Massachusetts.  This discarded trash strongly supports my belief that LE and others are using the office space at the Stoughton Location to manufacture and distribute controlled substances.

### Trash Recovered on February 2, 2019

31.     On February 1, 2019, at approximately 5:22 p.m., officers conducting electronic surveillance of 1749 Central Street in Stoughton, Massachusetts observed LE exit the side entrance of 1749 Central Street (which provides direct access into and out of the Stoughton Location) with four dark-colored plastic trash bags.  LE carried the trash bags to the rear of 1749

11

Central Street where he placed them into the far right dumpster. LE then walked empty-handed back to the building and reentered the building via the side entrance (which provides direct access into and out of the Stoughton Location).

32.      On February 2, 2019, at approximately 10:30 a.m., an MSP Trooper retrieved the trash from the far right dumpster at 1749 Central Street in Stoughton, Massachusetts. The only objects inside the dumpster were four gray plastic trash bags with blue handles and construction debris (*i.e.*, remnants of a carpet and a plastic bucket). Officers recovered, *inter alia,* the following from the four plastic trash bags discarded by LE:

     a.    Multiple clear, plastic bags of varying sizes with residue that were field-tested with presumptive positive results for MDMA;

     b.    Multiple clear, plastic bags of varying sizes with residue that were field-tested with presumptive positive results for Ketamine;

     c.    312 Dymo shipping label backers with notations that I believe concerned types of controlled substances and quantities being shipped;[1]

     d.    Numerous Priority Mail and/or Priority Mail Express labels with various return addresses, including "Dajour Cox" at the Rockland CMRA Mailbox; "JJ Bait and Tackle, 519 Crescent St., Brockton, MA 02302-3244," and "Michael Onza, 1629 Central St., Ste. 10, Stoughton, MA 02072-1693";

     e.    14 empty cardboard boxes from Switzerland listing various delivery addresses (including the LE Residence and various Target Mailboxes), such as "Binh Le" at the Le Residence; "BL Productions" at the Canton CMRA Mailbox; "Duane Freeman" at the North Easton Post Office Box; "Duane Freeman" at the North Easton CMRA Mailbox; and "Dajour Cox" at the Rockland CMRA Mailbox;

---

[1] I believe that these notations (*e.g., "56g MDMA," "3.5g Ket," "100 Dice"*) indicate types and quantities of controlled substances that LE and others are sending to customers of *EastSideHigh*. Based upon the notations on these recovered labels, I believe that this recovered trash indicates that LE and others have distributed more than 1,200 "Dice" (MDMA), more than 2,000 grams of MDMA, approximately 190 Xanax Bars, and more than 700 grams of Ketamine.

f.  3 empty padded envelopes from Canada listing various delivery addresses at the Target Mailboxes, such as "BL Productions" at the Canton CMRA Mailbox and "Duane Freeman" at the North Easton CMRA Mailbox; and

g.  1 USPS Parcel Select label bearing sender information of "Victory Packaging, LP, 355 Maple St., Bellingham, MA 02019" and a delivery address of "Binh Le" at the LE Residence.

**Trash Recovered on February 14, 2019**

33.     On February 14, 2019, at approximately 6:19 p.m., law enforcement officers and I were conducting electronic surveillance of 1749 Central Street in Stoughton, Massachusetts and observed LE exit the side entrance of 1749 Central Street (which provides direct access into and out of the Stoughton Location) and walk down the spiral stairs with a box that he appeared to break down once he got to the bottom of the stairs. LE walked to the rear of 1749 Central Street in the direction of the far right dumpster with the broken-down box. LE then walked back to the building empty-handed and reentered it via the side entrance. At approximately 6:23 p.m., LE again exited the side entrance of 1749 Central Street. This time, LE walked down the spiral stairs carrying two large, dark-colored plastic trash bags. LE stopped midway down the stairs and dropped the trash bags on the ground. LE continued down the stairs where he picked up the plastic trash bags. LE carried the trash bags to the rear of 1749 Central Street in the direction of the far right dumpster. LE then walked back to the building empty-handed and reentered it via the side entrance.

34.     At approximately 7:03 p.m. on February 14, 2019, an MSP Trooper recovered two gray plastic trash bags with blue handles and a broken-down box from the far right dumpster located at 1749 Central Street. These were the only objects inside the dumpster. Officers recovered, *inter alia,* the following from the two plastic trash bags discarded by LE:

a.  two heat-seal bags with residue that were field-tested with presumptive positive results for MDMA;

13

b.      a heat-seal bag and one clear, plastic bag with residue that was field-tested with presumptive positive results for Ketamine;

c.      520 Dymo shipping label backers with notations that I believe concerned types of controlled substances and quantities being shipped;[2]

d.      two empty cardboard boxes bearing a return address of "FU Global, 172 Trade Street, Lexington, KY 40511 USA," one of which was addressed to "BL Productions" at the Canton CMRA Mailbox, and the other addressed to "Dajour Cox" at the Rockland CMRA Mailbox;

e.      one Aliera Care card in the name of "Binh Le";

f.      eight empty padded envelopes from Canada listing various delivery addresses to the Target Mailboxes, such as "BL Productions" at the Canton CMRA Mailbox; "Duane Freeman" at the North Easton CMRA Mailbox; and "Duane Freeman" at the North Easton Post Office Box;

g.      a scale with blue residue;

h.      a Hamilton Beach blender with blue residue; and

i.      numerous Priority Mail and/or Priority Mail Express labels with various return addresses, including "Shaw, 311 Quincy St., Brockton, MA 02302-3419," "The Village, 1272 Washington St., Stoughton, MA 02072-3345," "Dan, 95 Washington St., Ste. 104, Canton, MA 02021-4013," and "JJ Bait, 519 Crescent St., Brockton, MA 02302-3244."

---

[2] As discussed in connection with the trash recovered on February 2, 2019, I believe that these notations indicate types and quantities of controlled substances that LE and others are sending to customers of *EastSideHigh*. Based upon the notations on these recovered labels, I believe that this recovered trash indicates that LE and others have distributed more than 1,200 "Dice" (MDMA), more than 5,000 grams of MDMA, and more than 1,600 grams of Ketamine.

**Trash Recovered on February 27, 2019**

35.     On February 27, 2019, at approximately 12:11 p.m., law enforcement officers reviewing electronic surveillance of 1749 Central Street in Stoughton, Massachusetts, observed LE appear from the direction of the front entrance of the building at 1749 Central Street with two gray trash bags with blue handles. LE carried the trash bags to the rear of 1749 Central Street and placed them into the far right dumpster. LE then walked empty-handed back to the building and exited out of view in the direction of the front entrance of the building. Approximately two minutes later, law enforcement officers observed LE reappear from the direction of the front entrance of the building at 1749 Central Street with two additional gray trash bags with blue handles. LE carried the trash bags to the rear of 1749 Central Street where he also placed these trash bags into the far right dumpster. LE then walked empty-handed back to the building and exited out of view in the direction of the front entrance of the building.

36.     On February 27, 2019, at approximately 7:09 p.m., an MSP Trooper retrieved the trash from the far right dumpster at 1749 Central Street in Stoughton, Massachusetts. The only objects inside the dumpster were four gray trash bags with blue handles. Officers recovered, *inter alia,* the following from the four trash bags discarded by LE:

      a.      a plastic bag containing blue powder that was field-tested with presumptive positive results for MDMA (total gross weight of 1100 grams);

      b.      a plastic bag containing blue powder that was field-tested with presumptive positive results for MDMA (total gross weight of 120 grams);

      c.      360 shipping label backers with notations that appear to indicate types and quantities of controlled substances being shipped;[3]

---

[3] As discussed in connection with the trash recovered on February 2 and 14, 2019, I believe that these notations indicate types and quantities of controlled substances that LE and others are sending to customers of *EastSideHigh*. Based upon the notations on these recovered labels, I believe that this recovered trash indicates that LE and others have distributed more than 1,500 grams of Ketamine, more than 1,800 grams of MDMA, and more than 4,000 "Trumps"

d.      numerous Priority Mail and/or Priority Mail Express labels with the return address "Shaw, 311 Quincy St, Brockton, MA 02302-3419."

e.      an empty cardboard box (with a packing slip) listing a return address of "TabletBindertdp, 336 Baker Street, Jamestown, NY 14701" and addressed to "Duane Freeman" at the North Easton CMRA Mailbox;

f.      six empty cardboard boxes (some with packing peanuts) from Switzerland listing delivery addresses to some of the Target Mailboxes, such as "Duane Freeman" at the North Easton Post Office Box and "BL Productions" at the Canton CMRA Mailbox;

g.      a checkbook with deposit tickets in the name of "Binh T Le" listing the LE Residence; and

h.      one live round of ammunition.

**Trash Recovered on March 10, 2019**

37.     On March 9, 2019, between approximately 4:37 p.m. and 4:51 p.m., a law enforcement officer conducting electronic surveillance of 1749 Central Street in Stoughton, Massachusetts observed LE appear from the direction of the front entrance of 1749 Central Street on multiple occasions carrying different items (e.g., a cardboard box bearing a black image on the side, containing other items; two cardboard Amazon boxes containing other items; a brown cardboard box containing other items; a computer monitor, a small cardboard box, and a gray trash bag with blue handles). The surveillance officer observed LE place all of the items in the far right dumpster, with the exception of the gray trash bag which LE placed in the second trash dumpster (from left to right). Each time, LE then walked empty-handed back to the building and reentered the building via the front entrance.

---

(which, based upon representations made on the *EastSideHigh* vendor page) are also believed to be MDMA.

38.     On March 10, 2019, at approximately 11:42 a.m., an MSP Trooper retrieved the

trash discarded by LE.  At the time, the only objects inside the far right dumpster were the items

that officers observed LE discard (*i.e.*, one computer monitor; one small cardboard box; two

cardboard Amazon boxes with other items in them; one cardboard box, bearing a black image on

the side, and containing other items; and one brown cardboard box containing other items).

From the second dumpster (from left to right), the MSP Trooper also recovered a single gray

trash bag with blue handles.[4]  Officers recovered, *inter alia,* the following from the cardboard

boxes and the gray trash bag discarded by LE:

- a.      one Asus black and orange laptop;

- b.      a MassDOT Massachusetts Department of Transportation RMV-1
  Application form for a 2018 BMW M3 listing "Binh Thanh Le" as the
  owner with a mailing address of the LE Residence and a certificate of title
  for the vehicle;

- c.      a discolored piece of paper with handwritten notations such as "9/18/18"
  and "9/19/18," "MDMA," "Dice," "Bars," "Worker Cut," and "Income"
  with what appears to be quantities (*e.g.*, "56g," "35g") and amounts (*e.g.*,
  "4 x 185," "5 Dice"); and

- d.      12 empty cardboard boxes from Switzerland listing delivery addresses to
  various of the Target Mailboxes, including "Duane Freeman" at the North
  Easton Post Office Box; "Duane Freeman" at the North Easton CMRA
  Mailbox; "BL Productions" at the Canton CMRA Mailbox; and "Dajour
  Cox" at the Rockland CMRA Mailbox.

**Trash Recovered on March 21, 2019**

39.     On March 19, 2019, at approximately 5:29 p.m., officers conducting electronic

surveillance of 1749 Central Street in Stoughton, Massachusetts observed LE exit from the

direction of the front entrance of 1749 Central Street with three dark-colored plastic trash bags.

---

[4] While there were other items in this second dumpster, there was only one gray trash
bag with blue handles.

LE carried the trash bags to the rear of 1749 Central Street where he placed them into the far right dumpster. LE then walked/ran empty-handed back to the building and reentered the building via the front entrance.

40.     On March 21, 2019, at approximately 8:30 p.m., an MSP Trooper retrieved the trash from the far right dumpster at 1749 Central Street in Stoughton, Massachusetts. The only objects inside the dumpster were three black plastic trash bags with gray handles. Officers recovered, *inter alia,* the following from the plastic trash bags discarded by LE:

     a.    Multiple clear, plastic bags of varying sizes with white residue;

     b.    Multiple clear, plastic bags of varying sizes with orange residue;

     c.    Orange pressed substance that was field-tested with presumptive positive results for MDMA;

     d.    Brown pressed substance that was field-tested with presumptive positive results for MDMA;

     e.    a credit application for LE listing his home address as the LE Residence and his occupation as "Lead Editor" of "BL Productions LLC," with a monthly income of $12,000;

     f.    a paper with notations that I believe concerned types of controlled substances and quantities being shipped; and

     g.    approximately 87 shipping label backers with notations that I believe concerned types of controlled substances and quantities being shipped.[5]

---

[5] As discussed in connection with the trash recovered on February 2, 14, and 27, 2019, I believe that these notations indicate types and quantities of controlled substances that LE and others are sending to customers of *EastSideHigh*. Based upon the notations on these recovered labels, I believe that this recovered trash indicates that LE and others have distributed more than 1,000 "PP" (MDMA), more than 1,400 grams of MDMA, and more than 800 grams of Ketamine.

**Other Evidence Supporting My Belief that LE and Others are Receiving Raw Materials to Manufacture Controlled Substances**

41.     During the course of the investigation, I have identified a number of parcels that I believe contained supplies associated with the controlled substances manufacture and distribution business being conducted by LE and others. According to my review of USPS records, many of these parcels were mailed internationally. These parcels were addressed to some of the same individuals whose names and addresses were found in the trash discarded by LE at 1749 Central Street in Stoughton, Massachusetts. A few of these parcels addressed to the Le Residence and the Target Mailboxes are discussed below.

42.     On November 6, 2018, Postal Inspectors executed a federal search warrant on a package that was mailed from California and addressed to "Binh Le" at the LE Residence. Postal Inspectors seized from the parcel approximately one kilogram of compressed white powder that field-tested presumptive positive for cocaine.

43.     From my review of USPS business records, I have identified several packages that were sent to the LE Residence and the Rockland CMRA Mailbox, each of which bore a return address of "*Robins Office Supply*, 381 Las Colinas Blvd. E., Irving TX 75039." Specifically, I have identified at least four packages that were mailed from Texas in June 2018 and addressed to "Dajour Cox" for delivery at the Rockland CMRA Mailbox. I have also identified at least two other packages that were mailed from Texas in June 2018 and addressed to LE at the LE Residence. In June 2018, Postal Inspectors executed a search warrant on a package bearing this same return address ("*Robins Office Supply*, 381 Las Colinas Blvd. E, Irving, TX 75039") and seized from the package 2.25 kilograms of green and white pills suspected to be Xanax. This leads me to believe that the packages that went to the LE Residence and the Rockland CMRA Mailbox also likely contained controlled substances.

44.     USPS business records further indicate that on July 21, 2018, a package was delivered to "Dajour Cox" at the Rockland CMRA Mailbox that bore the return address "*Tablet Binder*, 336 Baker St., Jamestown, NY 14701." Additionally, USPS business records indicate that on January 14, 2019, a package was delivered to "Duane Freeman" at the North Easton CMRA Mailbox that bore the same return address "336 Baker St., Jamestown, NY 14701" with an undetermined sender name.

45.     As discussed above, officers on February 27, 2019, recovered an empty cardboard box addressed to "Duane Freeman" at the North Easton CMRA Mailbox bearing this same return address with a sender name of "TabletBindertdp." Inside that empty box was a packing slip identifying the contents as two kilograms of "Blue Ready Mix Tablet Binder for Pill Pressing."

46.     I know from my training and experience that a tablet binder (also known as an "adhesive") is a term that refers to an ingredient used during the formulation process to help the other active and inactive ingredients in a tablet mix and stick together. Tablet binders are a necessary ingredient to ensure that the other various ingredients adhere (or bind) together during the tableting process.

47.     Additionally, I have reviewed numerous law enforcement reports that indicate that CBP has conducted border searches and seized suspected controlled substances (including LSD, MDMA, MDMA/Ecstasy, and Xanax) from packages sent from international sources that were to be delivered to several of the names and addresses appearing on the empty boxes found in the trash discarded by LE, including "Dajour Cox" at the Rockland CMRA Mailbox, "BL Productions" at the Canton CMRA Mailbox, "Duane Freeman" at the North Easton CMRA Mailbox, and "Duane Freeman" at the North Easton Post Office Box. A few of these seizures addressed to LE and to the Target Mailboxes are discussed below:

20

a.    On October 27, 2017, CBP at the Chicago, Illinois International Mail Branch ("IMB"), selected a package, originating from the Netherlands and addressed to "Dajour Cox" at the Rockland CMRA Mailbox for additional inspection.  The CBP officers conducted a border search of the package and seized approximately three grams of a substance that was then field-tested and determined to have the properties of LSD.

b.    On March 30, 2018, CBP, at the John F. Kennedy ("JFK") International Airport, IMB, selected a package, originating from Belgium and addressed to "Dajour Cox" at the Rockland CMRA Mailbox for additional inspection.  The CBP officers conducted a border search of the package and seized approximately 260 grams of a substance that was then field-tested with presumptive positive results for MDMA.

c.    On May 1, 2018, CBP, at the JFK International Airport, IMB, selected a package, originating from Germany and addressed to "Binh Le, 1318 Summit Dr., Bridgewater, MA 02324," for additional inspection.[6]  The CBP officers conducted a border search of the package and seized approximately 178 grams of a crystal-like substance that was then field-tested with presumptive positive results for the presence of MDMA/Ecstasy.

d.    On September 19, 2018, CBP, at the Chicago, Illinois IMB, selected a package, originating from Canada and addressed to "Dajour Cox" at the Rockland CMRA Mailbox for additional inspection.  The CBP officers conducted a border search of the package and recovered approximately 719 grams of green and white tablets.  According to the CBP report, the green tablets were labeled "s903," subsequently identified as a label prescription drug manufacturers use to identify Xanax tablets, and the white tablets were labeled "Xanax."

e.    On November 30, 2018, CBP, at the Chicago, Illinois IMB, selected a package originating from the Netherlands and addressed to "Duane Freeman" at the North Easton CMRA Mailbox for additional inspection.  The CBP officers conducted a border search of the package and recovered approximately 261 grams of a brown crystal-like powder that was then field-tested with presumptive positive results for the presence of MDMA/Ecstasy.

---

[6] No items relating this address have been recovered in the trash at 1749 Central Street in Stoughton, Massachusetts; however, records from the CLEAR database indicate that LE previously resided at 1318 Summit Drive in Bridgewater, Massachusetts, before moving to the LE Residence.  According to CLEAR, LE had moved from this address to the LE Residence by the time that this package was mailed.

f.     On March 9, 2019, CBP, at the Port Huron, Michigan Port of Entry, selected five packages, each originating from Canada and addressed to "BL Productions" at the Canton CMRA Mailbox (two packages), "Duane Freeman" at the North Easton Post Office Box (two packages), and "Duane Freeman" at the North Easton CMRA Mailbox (one package) for additional inspection. The CBP officers conducted a border search of each of the five packages and seized what is believed to be more than a combined total of 10,000 suspected Xanax pills from the five packages.

48.     Surveillance officers have observed LE travel directly to multiple CMRAs where he collected parcels, before heading directly to 1749 Central Street in Stoughton, Massachusetts. Upon his arrival at 1749 Central Street, LE was observed going into the Stoughton Location. One such example is set forth below.

49.     On December 12, 2018, I arranged for surveillance teams to establish position in the area of The UPS Store at 319 Centre Avenue in Rockland, Massachusetts as I was aware that a Priority Mail parcel sent from Oregon and addressed to "Dajour Cox" at the Rockland CMRA Mailbox was due to be delivered that day. This package had postage purchased from a third-party postage vendor that allows customers to purchase postage using crypto-currency.

50.     According to USPS records, the parcel was delivered to The UPS Store at approximately 11:26 a.m. At approximately 12:17 p.m., surveillance officers observed a black Mercedes S550 bearing Massachusetts Registration 9HA965 pull into The UPS Store's parking lot at 319 Centre Ave. in Rockland, Massachusetts. Massachusetts RMV records indicate that this vehicle was registered to Binh LE, 285 Menlo St., Brockton, MA 02301 (hereafter "LE's black Mercedes S550").[7] An Asian male, subsequently identified as LE, exited the car and entered The UPS Store. Surveillance officers observed no other individuals in LE's black Mercedes S550.

---

[7] Massachusetts RMV records erroneously refer to this vehicle as a "Mercedes Lanos."

51.     At approximately 12:20 p.m., surveillance officers observed LE exit The UPS Store with several parcels that he then placed in the trunk of LE's black Mercedes S550. LE then entered LE's black Mercedes S550 and drove directly to The UPS Store at 95 Washington St. in Canton, Massachusetts where LE rents CMRA mailbox #104-331. LE entered The UPS Store at approximately 12:45 p.m. and exited at approximately 12:53 p.m. The surveillance officers could not determine whether LE was carrying any objects in or out of The UPS Store.

52.     LE then drove his black Mercedes S550 across the street to a third CMRA, a Postal Center USA store at 18 Washington St. in Canton, Massachusetts where LE rents the Canton CMRA Mailbox. USPS records indicate that at approximately 11:10 a.m. on December 12, 2018, a package from Switzerland was delivered to Postal Center USA addressed to "BL Productions" at the Canton CMRA Mailbox.[8]

53.     LE entered the Postal Center USA at approximately 1:00 p.m. and exited at approximately 1:02 p.m. carrying a brown package, which he got into LE's black Mercedes S550 with. LE then drove LE's black Mercedes S550 to the Stoughton Location, where he arrived at approximately 1:08 p.m. LE exited LE's black Mercedes S550, went to the trunk, and began placing items in the trunk into a blue and yellow canvas bag. LE disposed of something in a nearby dumpster and then walked up a set of exterior spiral stairs with the blue and yellow canvas bag. LE then pulled a key ring from his pants pocket and used a key on it to open the door to the Stoughton Location.[9]

---

[8] USPS records indicate that, as of December 12, 2018, this was the third package mailed from Switzerland addressed to BL Productions that had been delivered to the Canton CMRA Mailbox since November 21, 2018.

[9] As discussed previously, LE incorporated BL Productions in August 2018 and listed "1749 Central St., Ste. 3, Stoughton, MA 02072" as the address where records for the company would be maintained. During my review of USPS records, I have also observed Priority Mail and Priority Mail Express parcels that were sent from Brockton, North Easton, South Easton,

**Other Evidence Indicating that Drug Manufacturing is Taking Place at the Stoughton Location**

54.     On January 11, 2019, I was made aware of a music video entitled *MTS - All for the Gang* on the internet that featured various individuals of interest to law enforcement. This music video appears at https://www.youtube.com/watch?v=tCRKaYOZDhU (last accessed on March 25, 2019) and was published on YouTube on January 3, 2019. After reviewing the video and comparing the layout of the Stoughton Location to what was seen in portions of the video, law enforcement officers and I believe that parts of the video were filmed inside the Stoughton Location. Approximately one second into the video, a pill press machine and bag of blue powder can be seen on a table in the background. Given the fact that these items are in the far background and are not otherwise featured in the video, I believe that these items were not props for the video, but are instead being used in the Stoughton Location to manufacture controlled substances.

***EastSideHigh* Is a Dark Net Vendor Selling Controlled Substances That I Believe Is Being Operated by LE**

55.     As part of the ongoing investigation, Postal Inspectors, including myself, have made three successful undercover purchases from a Dark Net vendor known as *EastSideHigh*. For the most part, *EastSideHigh* has appeared on the DNM known as *Dream Market*, although *EastSideHigh* recently has also appeared on the DNM known as *Wallstreet Market*. *EastSideHigh* has advertised for sale various controlled substances, including MDMA, Ketamine, and Xanax.

---

Stoughton, and West Bridgewater that listed "1749 Central St., Stoughton, MA 02072" as the return address. The postage on these parcels was issued by a third-party vendor that accepts crypto-currency as payment.

*EastSideHigh* **Vendor Profile on the DNM** *Dream Market*

56.     I have reviewed the vendor profile for *EastSideHigh* on the DNM *Dream Market* on numerous occasions, including as recently as March 24, 2019.  The vendor information for *EastSideHigh* listed a join date of April 24, 2018 with a "last active" date as "today" (March 24, 2019).  As of March 24, 2019, *EastSideHigh* had a customer rating of 4.97 and listed the number "4500" next to the rating, which I know, through my conversations with knowledgeable Postal Inspectors who have worked similar investigations, indicates their successful transactions number.  The *EastSideHigh* vendor page stated that they "ship orders within 24 hours after acceptance with the best stealth for both our security and yours.  Rarely orders will take 48 hours to be shipped due to security reasons."  The *EastSideHigh* vendor page further stated that they are "only offering Priority mail and Priority express shipping" and "REFUNDS/RESHIPS WILL BE OFFERED FOR SEIZE OR LOST PACKAGES."

57.     The *EastSideHigh* vendor page listed the following announcements under their *Terms and Conditions* section: "3/24: Escrow is back on. Order up bitches."  The *EastSideHigh* vendor page listed the following products for sale as of March 24, 2019:

    a.     Xanax Pressed Bars – *OUT OF STOCK*

    b.     MDMA Crystal

    c.     MDMA Pressed Pills

    d.     Ketamine.[10]

---

[10]     During an earlier review of the *EastSideHigh* vendor page on both November 6 and 13, 2018, by law enforcement officers, I know that *EastSideHigh* also listed for sale "Uncut FishScale Cocaine," which was identified as "Out of Stock."  On November 4, 2018, the *EastSideHigh* vendor page had a comment under *Terms and Conditions* that, "We are running into sourcing issues, restock are taking longer than expected."  On that date, the *EastSideHigh* vendor page also had an announcement dated October 29 acknowledging that, "If you read my feedback you'll notice some negative reviews for our last batch of ketamine before we went on vacation.  We are working on making sure this new batch is of top quality.  We apologize."

### *EastSideHigh* **Vendor Page on the DNM** *Wallstreet Market*

58.     I have also reviewed the vendor profile for *EastSideHigh* on *Wallstreet Market* on

numerous occasions, including as recently as March 24, 2019.  The *EastSideHigh* User-Profile

page listed a "member since" date of March 13, 2019 with a "last online" date as "about 6 hours

ago."  Also listed on *EastSideHigh*'s User-Profile page was an "open/completed" amount of

"99/48" indicating to me that *EastSideHigh* has 99 open orders and 48 completed orders.  The

vendor page stated that "We are EastSideHigh migrated from Dream Market where we had

4300+ Successful Orders with 4.97/5 Star ratings."  The *EastSideHigh* vendor page also stated

that they "ship orders within 24 hours after acceptance with the best stealth for both our security

and yours.  Rarely orders will take 48 hours to be shipped due to security reasons."  The

*EastSideHigh* vendor page further stated that they are "only offering Priority mail and Priority

express shipping" and "REFUNDS/RESHIPS WILL BE OFFERED FOR SEIZE OR LOST

PACKAGES."

59.     The *EastSideHigh* vendor page listed the following announcements under their

*Terms and Conditions* section:

       a.     "Guys please select and pay for shipping. I WILL cancel your order if you don't"

       b.     "3/18: Combined Shipping option added *"

       c.     "We will only ship orders once it is marked paid"

60.     The *EastSideHigh* vendor page listed the following products for sale as of March

24, 2019:  MDMA Crystal, MDMA Pressed Pills, and Ketamine.  On the offer page for MDMA

Crystal, *EastSideHigh* listed "quantity in stock" as "19137 Gram," an "already sold" amount of

"> 800.00 Gram," and amount of views as "> 900."  On the offer page for MDMA Pressed Pills,

*EastSideHigh* listed "quantity in stock" as "10254 Piece," an "already sold" amount of "> 1700

26

Piece," and amount of views as "> 700." On the offer page for Ketamine, *EastSideHigh* listed "quantity in stock" as "9131 Gram," an "already sold" amount of "> 800.00 Gram," and amount of views as "> 1000."

### Surveillance Observations of LE Confirm that LE's Conduct is Consistent with A Dark Net Distributor of Controlled Substances

61.     Additionally, during the course of the investigation, surveillance officers and I have conducted in-person and electronic surveillance of LE and motor vehicles operated by LE. On multiple instances, we have observed LE leave the Stoughton Location and drive to various post offices (including in Stoughton, North Easton, South Easton, and West Bridgewater) and place numerous envelopes in the blue collection boxes at those post offices. We have also observed LE travel directly from one post office in one town, where he placed envelopes in the blue collection box at that post office, to a second post office in another town where LE again placed multiple envelopes in the blue collection box at that second post office. On some days, LE then repeated this process by going to a third (and occasionally, a fourth) post office where he again placed multiple envelopes in the blue collection boxes at these additional post offices. Based upon my training and experience, as well as my discussions with other law enforcement agents who have participated in investigations involving the distribution of controlled substances via the internet, this pattern of mailing envelopes at multiple post offices is a practice frequently utilized by individuals who are distributing drugs via Dark Network Markets in order to evade detection by law enforcement and/or avoid arousing the suspicion of USPS employees.

62.     Some of these activities are discussed below.

**January 2019:  The Second Successful Undercover Purchase of Controlled Substances from *EastSideHigh*[11]**

63.     On January 24, 2019, I accessed the *Dream Market* website in an undercover capacity for the purpose of making a controlled purchase of MDMA from the vendor *EastSideHigh*.  I placed an order for "5 Blue 'Dices' 180-210mg MDMA Pressed," that was listed with a unit price of 0.0131 BTC ($46.80 USC).[12]  The total price for the five tablets of MDMA and Priority Mail Express shipping (which had a unit price of 0.00672 BTC [$24.00 USC]) was 0.01984 BTC ($70.80 USC).  I subsequently received notice on January 24, 2019 that my order was accepted and later received notice that my order was "sent" by *EastSideHigh*.

64.     Later on January 24, 2019, I arranged for surveillance teams to establish position in the vicinity of the Stoughton Location.  I also arranged for surveillance teams to monitor several post offices where LE was known to mail packages.

65.     At approximately 1:23 p.m. on January 24, 2019, law enforcement officers conducting electronic surveillance of 1749 Central Street in Stoughton, Massachusetts observed

---

[11]  An earlier undercover purchase occurred in September 2018.  With respect to this purchase, a Postal Inspector, acting in an undercover capacity, ordered ten (10) tablets/pills of MDMA (two [2] orders of "**SALE!!**5 Orange 'Dices' 180-210mg MDMA Pressed") from *EastSideHigh* on the DNM *Dream Market*.  Approximately four days later, the Postal Inspector received a Priority Mail envelope mailed from Brockton, Massachusetts.  The envelope bore a return address of "319 Centre Ave., Ste. 104-331, Rockland, MA 02370-2613," which is a combination of the Rockland CMRA Mailbox address ("319 Centre Ave., Rockland, MA 02370") and the number of the private mailbox being rented by LE at The UPS Store in Canton, Massachusetts ("Ste. 104-331"). The envelope contained a silver Mylar packet, inside of which was a small, clear, plastic heat-sealed packet.  Within the heat-sealed packet was one clear plastic baggie containing ten orange square tablets that were field-tested with presumptive positive results for methamphetamine or MDMA (Ecstasy).

[12]  The crypto-currency Bitcoin ("BTC") was used to purchase the controlled substance. The approximate exchange rate of one BTC on January 24, 2019 was approximately $3,546.13 U.S. Currency ("USC").

LE park LE's black Mercedes S550 in the parking lot of 1749 Central Street. LE exited the vehicle empty-handed, walked up the exterior spiral stairs, and entered the Stoughton Location.

66.     At approximately 4:00 p.m., law enforcement officers conducting electronic surveillance of 1749 Central Street observed LE exit the front entrance of 1749 Central Street with a bag. LE walked to LE's black Mercedes S550, entered the vehicle (while still carrying the bag), and drove away.

67.     At approximately 4:07 p.m., surveillance officers observed LE park in the customer parking lot for the Stoughton, Massachusetts Post Office. Surveillance officers observed LE walk to the blue collection box located in front of the Post Office and deposit numerous cardboard envelopes into the blue collection box. LE then walked back to the parking lot, got back into his vehicle, and, at approximately 4:08 p.m., exited the parking lot and drove towards the town of Easton, Massachusetts.

68.     At approximately 4:11 p.m., a Postal Inspector opened the blue collection box at the Stoughton, Massachusetts Post Office into which LE deposited the cardboard envelopes. The Postal Inspector reviewed the contents and, amongst other pieces of unrelated mail, were eight USPS Priority Mail Express Flat Rate Envelopes bearing the same return address of "Michael Conway, 1629 Central St, Stoughton, MA 02072-1693." Each of these envelopes bore postage that was purchased from a third-party vendor that allows customers to purchase postage using crypto-currency. One of the envelopes (hereinafter referred to as "UC Parcel #2") was addressed to the undercover identity I used when I placed the order from *EastSideHigh* earlier that morning. The Postal Inspector retained and secured the UC Parcel.

69.     At approximately 4:18 p.m. that same day, surveillance officers observed LE park his vehicle in the parking lot of the North Easton, Massachusetts Post Office directly to the right

29

of the blue collection box. Surveillance officers observed LE walk to the blue collection box and deposit numerous cardboard envelopes into the box before walking back to his vehicle. At approximately 4:19 p.m., LE exited the parking lot and turned left onto Main Street. At this time, law enforcement officers terminated their surveillance of LE's activities.

70.     I subsequently took custody of UC Parcel #2, which was a white USPS Priority Mail Express Flat Rate Envelope, measuring approximately 12.5 inches by 9.5 inches with a weight of approximately ten (10) ounces, and $17.79 in postage. The envelope had a return address of "Michael Conway, 1629 Central St, Stoughton, MA 02072-1693." Inside UC Parcel #2 was one beige padded manila envelope, which contained one silver Mylar packet. Inside the silver Mylar packet was one small, clear heat-sealed packet, which contained one small, clear plastic baggie. Within the plastic baggie were five blue square tablets, suspected of being MDMA. Each tablet had a dice five imprint on one side and a dice three imprint on the other side. I conducted a field test which resulted in a presumptive positive for Methamphetamine or MDMA (Ecstasy).

71.     A subsequent review of USPS records indicate that numerous Priority Mail Express and Priority Mail envelopes bearing the same return address as UC Parcel #2 ("Michael Conway, 1629 Central St., Stoughton, MA 02072-1693") were scanned as accepted at various post offices in southeastern Massachusetts on January 24, 2019 after 5:00 p.m. Like UC Parcel #2, these envelopes also bore postage that was purchased from a third-party vendor that allows customers to purchase postage using crypto-currency. As discussed above, surveillance officers observed LE at two of these three post offices mailing envelopes between 4:07 and 4:18 p.m.[13]

_____

[13]  Surveillance was terminated after officers observed LE mailing items at the North Easton, Massachusetts Post Office. Due to a malfunction of the judicially-authorized GPS

| Post Office Scanned At | Number of Mailings | Return Address |
|---|---|---|
| Stoughton | Eight Priority Mail envelopes (including UC Parcel #2, which was not scanned) | Michael Conway 1629 Central St., Stoughton, MA 02072-1693 |
| North Easton | Five Priority Mail envelopes | Michael Conway 1629 Central St., Stoughton, MA 02072-1693 |
| South Easton | Seven Priority Mail envelopes | Michael Conway 1629 Central St., Stoughton, MA 02072-1693 |

### February 2019: Third Successful Undercover Purchase of Controlled Substances from *EastSideHigh*

72.     On February 14, 2019, I accessed the *Dream Market* website in an undercover

capacity to make another controlled purchase of MDMA from the vendor *EastSideHigh*. I

placed an order from *EastSideHigh* for "2G Pure MDMA Crystal Fast Shipping," which was

listed for sale with a unit price of 0.02045 BTC ($72.80 USC).[14] The total price for the two

grams of MDMA and Priority Mail Express shipping (which had a unit price of 0.00674 BTC

[$24.00 USC]) was 0.02715 BTC ($96.80 USC). I subsequently received notice on February 14,

2019 that my order was accepted and later received notice that my order was "sent" by

*EastSideHigh*.

73.     Later on February 14, 2019, I arranged for surveillance teams to establish position

in the vicinity of 1749 Central Street in Stoughton, Massachusetts. I also arranged for

surveillance teams to monitor several Post Offices where LE was known to mail packages.

---

device on LE's black Mercedes S550, I do not know where LE traveled after mailing items at the
North Easton, Massachusetts Post Office.

[14] The crypto-currency Bitcoin ("BTC") was used to purchase the controlled substance.
The exchange rate of one BTC on February 14, 2019 was approximately $3,561.50 U.S.
Currency ("USC").

74.     At approximately 11:24 a.m. on February 14, 2019, officers conducting electronic surveillance of 1749 Central Street in Stoughton, Massachusetts observed LE park LE's black Mercedes S550 in the parking lot of 1749 Central Street.  At approximately 11:26 a.m., LE exited the vehicle carrying a red and blue object.  LE then walked up the exterior spiral stairs and entered the Stoughton Location.

75.     At approximately 1:49 p.m. on February 14, 2019, officers conducting electronic surveillance of 1749 Central Street in Stoughton, Massachusetts observed LE walk to LE's black Mercedes S550 carrying an object that appeared to be a money counter.  LE placed the object in the backseat of the vehicle.  LE then removed a black and white bag and a brown cardboard box from the backseat and placed those items in the vehicle's trunk.  LE then got into the vehicle and drove away.

76.     Surveillance officers followed LE's black Mercedes S550 to the vicinity of 18 Washington Street in Canton, Massachusetts, near the Postal Center USA and a Dunkin' Donuts. LE exited the vehicle and walked to the entrance of Dunkin' Donuts.  After momentarily entering, LE exited the facility accompanied by an Hispanic male, who was subsequently identified by surveillance officers.  The Hispanic male was carrying a backpack.

77.     The Hispanic male then entered the backseat of LE's black Mercedes S550 from the passenger side of the vehicle and LE entered the backseat from the opposite side of the vehicle.  Both individuals remained inside the vehicle for approximately ten (10) minutes.  Upon exiting, the Hispanic male was still carrying the backpack.  The Hispanic male walked directly toward a black Honda Accord bearing Massachusetts registration 5KG742, which was registered to him.  The Hispanic male entered the black Honda Accord and left the area.  LE subsequently

entered the front driver's seat of LE's black Mercedes S550 and returned back to 1749 Central Street.

78.     Based upon subsequent undercover communications that I have had with a representative of *EastSideHigh* believed to be LE who was seeking assistance in exchanging Bitcoin for cash, I believe that LE met with the Hispanic male for the purpose of exchanging Bitcoin obtained from his drug trafficking activities for U.S. Currency.

79.     At approximately 2:04 p.m. on February 14, 2019, officers conducting electronic surveillance observed LE park LE's black Mercedes S550 in the parking lot of 1749 Central Street in Stoughton, Massachusetts.  LE exited the vehicle, and then reentered it through the left rear passenger side door.  LE then emerged from the backseat of the vehicle carrying what appeared to be the money counter, and walked towards the front entrance of 1749 Central Street.

80.     At approximately 6:30 p.m., LE and another individual known to investigators exited 1749 Central Street via the side entrance, get into their respective vehicles, and departed the area.  Surveillance officers followed both individuals, but observed nothing of investigatory significance.  At approximately 7:03 p.m., agents terminated physical surveillance.  At approximately 7:14 p.m., officers conducting electronic surveillance observed LE return and park LE's black Mercedes S550 in the parking lot of 1749 Central Street.  LE exited the vehicle and walked in the direction of the front entrance of the building.  LE exited from view, leading the officers to believe that LE entered the building.

81.     At approximately 12:22 a.m. on February 15, 2019, data from a judicially-authorized GPS device on LE's black Mercedes S550 indicated that the vehicle was moving.  I reviewed the pole camera footage of 1749 Central Street and observed that, at approximately 12:19 a.m., an individual, believed to be LE, exited the side entrance of 1749 Central Street

carrying an open box.  The individual walked down the spiral staircase and put the box into the passenger side seat of LE's black Mercedes S550.  The individual then entered the vehicle and departed the area.

82.     USPS records indicated that a package mailed to my undercover identity ("UC Parcel #3") was scanned as accepted at the North Easton, Massachusetts Post Office on the morning of February 15, 2019.  At my instruction, an MSP Trooper recovered UC Parcel #3 from the North Easton, Massachusetts Post Office later that morning.  UC Parcel #3 is a white USPS Priority Mail Express Flat Rate Envelope, measuring approximately 12.5 inches by 9.5 inches with a weight of approximately ten ounces, and $17.79 in postage, which was purchased from a third-party vendor that allows customers to purchase postage using crypto-currency.  UC Parcel #3 had a return address of "Shaw, 311 Quincy St, Brockton, MA 02302-3419."  (As discussed previously, agents recovered Priority Mail and/or Priority Mail Express labels with this return address in the trash discarded by LE at 1749 Central Street.)

83.     Inside UC Parcel #3 was one beige padded manila envelope, which contained one silver Mylar packet.  Inside the silver Mylar packet was one small, clear heat-sealed packet, which contained one small, clear plastic baggie.  Within the plastic baggie was a brown rock-like substance, suspected of being MDMA.  I conducted a field test which resulted in a presumptive positive result for Methamphetamine or MDMA (Ecstasy).  The substance had a total gross weight of ten grams.

84.     I subsequently reviewed surveillance camera footage from the North Easton Post Office and determined that LE deposited cardboard envelopes into the blue collection box located outside the North Easton, Massachusetts Post Office between approximately 1:10 a.m. and 1:11 a.m. on February 15, 2019.

85.     USPS records for the morning of February 15, 2019, indicate that numerous Priority Mail Express and Priority Mail envelopes bearing the same return address as UC Parcel #3 ("Shaw, 311 Quincy St, Brockton, MA 02302-3419") were scanned as accepted at various post offices in southeastern Massachusetts on the morning of February 15, 2019.  Like UC Parcel #3, these envelopes also bore postage that was purchased from a third-party vendor that allows customers to purchase postage using crypto-currency.  Data from the GPS device on LE's black Mercedes S550 indicates that LE drove to the area of these same post offices and, in some instances, their postal collection boxes during the early hours of February 15, 2019 as follows:

| GPS Data on February 15, 2019 | Post Office Scanning Envelopes as Accepted | Number of Mailings |
| --- | --- | --- |
| 12:58 a.m. – vicinity of blue collection box at 16 Tosca Drive, Stoughton, MA 02072 | Stoughton Post Office | Eight Priority Mail Express envelopes |
| 1:08 a.m. – vicinity of North Easton Post Office | North Easton Post Office | Five Priority Mail Express envelopes (including UC Parcel #3) |
| 1:14 a.m. – vicinity of South Easton Post Office | South Easton Post Office | Five Priority Mail Express envelopes |
| 1:27 a.m. – vicinity of Raynham Center Post Office | Raynham Center Post Office | Four Priority Mail Express envelopes |
| 1:56 a.m. – vicinity of blue collection box at 351 Bedford St., Whitman, MA | Whitman Post Office | Three Priority Mail envelopes |
| 2:37 a.m. – vicinity of West Bridgewater Post Office | West Bridgewater Post Office | Five Priority Mail envelopes |

Based on my training and experience, I believe that this data is consistent with LE having mailed parcels containing controlled substances from the Dark Net vendor *EastSideHigh*.

**Other Parcels Bearing Return Addresses Appearing in the Trash Discarded by LE Have Also Been Found to Contain Controlled Substances**

86.     On two occasions in February 2019, I recovered parcels that had been provided to law enforcement by individuals employed at businesses that had received a returned piece of mail not sent by anyone associated with the business.  One of those businesses was J&J Bait &

Tackle, which is located 519 Crescent St., Brockton, MA 02302; the other business was The Village Pub, which is located at 1272 Washington St., Stoughton, MA 02072. An employee at each business had opened the parcel returned to their respective business, each of which bore the respective business's return address and was marked "Return to Sender." Upon opening the parcel and discovering what the individual believed contained a controlled substance, the employee notified law enforcement.

87.    I am in possession of both of these parcels. The parcels share certain similar characteristics: (1) each was a white USPS envelope (one Priority and one Priority Express) measuring approximately 12.5 inches by 9.5 inches; (2) each had postage purchased from a third-party vendor that allows their customers to purchase postage using crypto-currency; (3) each contained a beige manila envelope, inside of which was a silver Mylar packet and inside of the silver Mylar packet was a small, clear heat-sealed packet that contained another small, clear plastic baggie; (4) inside the small, clear plastic baggie was a substance that field-tested presumptive positive for controlled substances (in the case of the parcel returned to J&J Bait & Tackle—Ketamine; in the case of the parcel returned to The Village Pub—Methamphetamine or MDMA (Ecstasy)).

88.    Based upon my knowledge, training, and experience, as well as my participation in this investigation, I believe that both of these parcels are connected to *EastSideHigh*. As discussed above, Priority Mail and/or Priority Mail Express labels with various return addresses, including "JJ Bait and Tackle, 519 Crescent St., Brockton, MA 02302-3244" and "The Village, 1272 Washington St., Stoughton, MA 02072-3345," have been recovered from the trash discarded by LE at 1749 Central Street in Stoughton, Massachusetts.

**Probable Cause Exists to Believe that LE and Others Are Committing the Target Offenses**

89.     In sum, based on my knowledge, training and experience, as well as my participation in the instant investigation, I believe that the conduct of LE and others is consistent with the operation of a Dark Net vendor that is receiving, manufacturing, and distributing controlled substances.

**EVIDENCE RELATING TO THE TARGET OFFENSES IS LIKELY TO BE FOUND AT THE TARGET LOCATIONS**

90.     I am requesting search warrants for both the Stoughton Location and the LE Residence.  As discussed above, agents have recovered considerable evidence from the trash discarded by LE at 1749 Central Street in Stoughton, Massachusetts establishing that LE and others are processing, manufacturing, and preparing controlled substances for distribution at the Stoughton Location.

91.     Based upon my discussions with other, more experienced law enforcement officers who have participated in investigations of Dark Net vendors, I am aware of the following kinds of evidence, as set forth in Attachment B-1, relating to drug manufacture/distribution and drug proceeds that have typically been recovered from the search of locations where individuals operating as Dark Net Vendors are receiving, processing, manufacturing, storing, and distributing controlled substances:

      a.    Controlled substances.

      b.    Implements and materials used in connection with the processing, manufacture, production, storage, packaging, or dispensing of controlled substances such as pill presses; scales; funnels; sifters; grinders; raw materials or ingredients used as binders when making tablets containing controlled substances; postage; packaging materials; scales; plastic bags; plastic containers; cardboard boxes; mailing envelopes; packaging tapes; labels; label machines; vacuum- or heat-sealers; and Mylar packets.

37

c.  Records and tangible objects relating to the transportation, ordering, purchase, storage, and distribution of controlled substances or proceeds of controlled substances. Such records include, but are not limited to, ledgers; customer lists, dealer lists, and contact information for any of these customers or dealers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; money orders; wire transfers; vehicle rental receipts; credit card receipts; records and keys related to rental properties and/or storage units; records related to the rental of post office boxes or other locations where mail may be received, such as Commercial Mail Receiving Agency private mail boxes.

d.  Records and tangible objects pertaining to shipments of controlled substances, including air bills, labels for overnight deliveries and Express Mail deliveries, receipts and other documents pertaining to such shipments.

e.  Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

f.  Virtual or digital or crypto-currency in any format, including but not limited to, wallets (digital and paper), public keys (addresses) and private keys, as well as documents, records, or information relating to the transfer, purchase, sale or disposition of such currency, including passwords for wallets used to store such currency.

g.  Cash, currency, and currency counting machines, and records and tangible objects relating to income derived from the sale of controlled substances and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; bank records (including cashier's checks; checkbooks; passbooks; certificates of deposit).

h.  Records and tangible objects reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

i.  Items of personal property that tend to identify the person(s) in control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in businesses, such as canceled

38

mail, deeds, leases, rental agreements, photographs, personal telephone books, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

j.     Records or tangible objects relating to email, online, or Dark Net accounts used to purchase, manufacture, or distribute controlled substances, including:

   i.     Records or tangible objects relating to the Dark Net vendor *EastSideHigh*.

   ii.    Records or tangible objects relating to other vendor names used to purchase, receive, store, manufacture, or distribute controlled substances in furtherance of the Target Offenses.

k.     Firearms and ammunition.

l.     Records and tangible objects pertaining to the travel or whereabouts of Binh Le between June 2018 and the date that this warrant is executed.

m.    Records and tangible objects pertaining to the existence, identity, and travel of any co-conspirators, as well as any co-conspirator's acts taken in furtherance of the crimes listed above.

n.     Computer(s), digital storage media, or digital storage devices, any physical object upon which computer data can be recorded, computer hardware, computer software, servers, computer related documentation, computer passwords and data security devices, gaming devices, tablets, flash drives, volatile data, digital communications devices, cellular telephones, cameras, videotapes, video recording devices, video recording players, and video display monitors, digital input and output devices such as keyboards, mouse(s), scanners, printers, monitors, electronic media and network equipment, modems, routers, connection and power cords, and external or connected devices used for accessing computer storage media that was used to commit or facilitate commissions of the Target Offenses; as well as evidence that tends to identify the person having dominion and control over the devices, such as electronic address books or contact lists on the phone, call logs, saved text messages, photographs, saved usernames and passwords and documents.

92.    The recovered trash discarded by LE at 1749 Central Street provides considerable basis to believe that controlled substances, as well as items typically found to be used by individuals engaged in the receipt, manufacture and distribution of controlled substances, will be

found at the Stoughton Location. Indeed, as discussed above, the discarded trash recovered by law enforcement officers at 1749 Central Street in Stoughton, Massachusetts establishes that most of these items have been maintained at the Stoughton Location.

93.     Based upon my training and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences of drug-traffickers, I am aware that many of the same kinds of evidence relating to drug trafficking and the proceeds from the sales of drug trafficking have typically been recovered from the search of the drug-traffickers' residences. These items are set forth in Attachment B-2.

94.     Based upon my training, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers engaged in commercial transactions via the Dark Net to maintain both at their manufacturing site and in their residences various items and records relating to their drug trafficking activities. During this investigation, I have seen evidence that LE uses not only the Stoughton Location, but also the Le Residence in furtherance of his commission of the Target Offenses. For example, as discussed above, in November 2018, law enforcement officers seized a package containing controlled substances (approximately one kilogram of cocaine) that was to be delivered to the LE Residence.

95.     Additionally, I am aware that drug traffickers often keep ledgers to show balances due for drugs sold in the past and for payments expected as to the trafficker's suppliers and the trafficker's dealers. Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. And, when, as here, the drug trafficking activity is conducted via the

Dark Net, the drug traffickers must be able to access these records via a computer, cellphone, or other internet-accessible device.

96.     I am also aware that drug traffickers engaged in Dark Net commerce often maintain records related to their drug trafficking activities both at the site of their physical operation and at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.  Additionally, drug traffickers engaged in Dark Net distribution of controlled substances will maintain electronic records of their activities, which they will access both at the manufacturing/distribution site and at their residences.  Even when drug dealers store their drugs outside their residence, I am aware that they often will keep and/or access records relating to these offsite storage locations at their primary residence.  Such documents include rental or storage property agreements and receipts.

97.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers engaged in Dark Net drug trafficking to maintain not only electronic crypto-currency representing proceeds from drug sales, but also large sums of cash (that has resulted from the conversion of crypto-currency) both at their manufacturing/distribution site and at their residences.  Furthermore, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances and/or to launder the proceeds from the sales of controlled substances.  Such individuals will often maintain records of these transactions for a period of time in case there is a later dispute concerning what funds were transmitted and when.  Drug traffickers also often maintain one or more currency counting machines to aid in counting their drug proceeds.  As discussed above, surveillance officers

observed LE in possession of what they believed was a currency counting machine on February 14, 2019.[15]

98.     Many drug dealers receive their drugs through overnight parcels and keep mailing labels and air bills both used and unused in their residence for future use. This is particularly true where, as here, Dark Net distribution of controlled substances typically involves the distribution of controlled substances via the mail. Moreover, as previously discussed, the trash recovered at 1749 Central Street provides ample evidence that LE and others are both receiving and sending packages containing controlled substances through the mail.

99.     Many experienced drug traffickers will often engage in money laundering to conceal the source of their drug proceeds and will use the proceeds to purchase legitimate investments or expensive vehicles, jewelry and precious metals. In other instances, drug traffickers will combine the cash from their drug trafficking with cash deposits from other legitimate business activities in an attempt to hide their illegal conduct. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking and/or money laundering is also typically maintained both at their business and at their residence. Among other things, in this case, agents originally observed LE operating a 2014 black Mercedes S550, which was registered in his name. During the course of the investigation, agents observed LE at a car dealership and then observed LE operating a 2018 BMW M3, which based upon records retrieved from the trash, LE appears to have purchased.

---

[15] Additionally, over the past week, I have been in undercover communications with someone associated with *EastSideHigh,* whom I believe is LE. These communications, which have occurred using the encrypted communications application Wickr, concern the expressed interest of the individual (who is using the moniker *eastshoreride*) to exchange more than $100,000 of Bitcoin for U.S. currency.

100.    Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that drug traffickers generally try to hide cash and sensitive documents related to their drug trafficking and money laundering activities in safes or other containers so that other individuals who are at their place of business or at their residence do not discover these materials.

101.    During the course of residential searches, I and other agents have also found items of personal property that tend to identify the person(s) occupying and controlling the subject premises. Evidence of occupancy, residency, rental and/or ownership of the premises is relevant to the prosecution of the Target Offenses. Such identification evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys. Furthermore, I have learned from this and other investigations that records of occupancy linking a person to a particular location are durable and are reasonably likely to be maintained for long periods of time for several reasons. Many documents and records are largely innocuous, or at least are perceived as such, while many documents and records have other utility. For example, a person involved in the trade of illegal drugs is unlikely to discard passports, licenses, titles to motor vehicles, bank books, address books, and bills. These are necessary to prove ownership – even if they are in the name of a proxy – and they can be helpful when attempting to flee police. Similarly, innocuous items of attribution on a computer or smartphone can also aid in identifying the individual(s) who are using the electronic device at the time that electronic records indicate that drug trafficking and/or money laundering activities using the electronic device transpired.

102.    Based on training and experience, I know that most drug dealers regularly use cellular telephones to communicate about their drug trafficking and money laundering activities with customers, suppliers, and other coconspirators.  In my training and experience, I also am aware that drug traffickers are often aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular phones at the same time, as well as prepaid cellular phones (where the subscriber of the phone is not required to provide personal identifying information), in an effort to thwart law enforcement's use of electronic surveillance.  Because cellular telephones are often a principal means of communication, drug dealers typically keep the phones in close proximity or at their residence.  Additionally, in my experience, many drug dealers do not dispose of their cellular telephones when getting a new number, but instead just discard them in various locations in their residences.  As a result, it is common to recover not only paper records pertaining to the use of the cellular phone by drug dealers, such as bills, call detail records, statements, and other documents, but the cellular telephones themselves, from drug dealers' residences.

103.    Agents have conducted a preliminary review of the laptop computer that was recovered from the trash at 1749 Central Street in Stoughton, Massachusetts on March 10, 2019.  On the computer is a copy of LE's Massachusetts driver's license, leading me to believe that LE had access to and used this laptop computer.  Forensic analysis further reveals that an Apple iPhone was, at one point, plugged into the laptop.  This leads me to believe that LE is using an Apple iPhone, which is a type of smartphone.  Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of

electronic data.  Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

104.    Based upon my knowledge, training and experience, I know that a cellular telephone is a handheld wireless device used primarily for voice communication through radio signals.  These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities.  These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.  Based on my training and experience, I know that many cellular telephones have the capabilities described above.

105.    Seizure of devices containing this information will also provide information relating to coconspirators and accomplices.  I know, based upon my training and experience, as well as consultation with other investigators, that individuals who sell illegal drugs typically use cellular telephones to communicate with their suppliers, their customers, and with other coconspirators, and that they communicate via voice calls and via electronic communications.  I also know that persons who sell illegal drugs regularly keep records of their illegal activities.  These records can include, but not limited to, contact list of buyers and sellers, ledgers

of sales and money owed by customers or to suppliers, and lists of quantities and/or specific controlled substances preferred by or ordered by specific customers. Individuals engaged in drug trafficking activities often take photographs of their closest confederates. Records of drug trafficking activities can be produced and maintained on paper in a tangible form and/or by electronic means on cellular telephone, electronic/digital storage device and/or a computer. In the case of electronic or digital media, the information can be maintained on the device itself or on portable digital storage media, making it easier to conceal. I know that individuals involved in the sale of drugs are very secretive in their activity in an effort to avoid detection, arrest and prosecution, and such persons usually are careful to deal only with someone they know, or who have been introduced to them by someone they know. Additionally, in the conduct of their activities, they frequently employ code words or colloquial jargon when writing, texting or speaking on the telephone or in person, being careful to avoid the use of actual names of persons or narcotic substances, which, if overheard or seen, would be incriminating to themselves or their criminal associates. From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachments B-1 and B-2 on their cellular telephones.

106. Additionally, I know that many drug traffickers often use computers, cellular telephones, or other electronic devices having internet capabilities in order to communicate quickly and economically with their suppliers via the internet and/or email. This is particularly true where, as here, the investigation establishes that LE is operating as *EastSideHigh* on various DNMs to distribute controlled substances in furtherance of the Target Offenses. Because *EastSideHigh* is strictly an electronic vendor on the Dark Net, use of computers or other

electronic devices capable of accessing the internet (such as a smartphone) are required in order for *EastSideHigh* to function.

107.    I am also aware that individuals frequently use computers to create and store records of their actions by communicating with others through e-mail, instant messages, and updates to online social-networking websites; drafting letters; keeping their calendars; arranging for travel; storing pictures; researching topics of interest; buying and selling items online; and accessing their bank, financial, investment, utility, and other accounts online. Additionally, many cellular phones today have a GPS navigation device on the phone. Examination of the GPS data on a cellular phone can provide valuable evidence as to the locations where drug traffickers meet with coconspirators, including their sources of supply, and can aid in identifying those individuals. Additionally, review of GPS data can aid in identifying offsite locations where drug traffickers store drugs, maintain bank accounts, and conceal their drug proceeds.

108.    From my training, experience, and information provided to me by other agents, I am also aware that individuals frequently use computers to create and store records of their actions by communicating about them through e-mail, instant messages, and updates to online social-networking websites; drafting letters; keeping their calendars; arranging for travel; storing pictures; researching topics of interest; buying and selling items online; and accessing their bank, financial, investment, utility, and other accounts online. I am also aware that personal computer systems are generally capable of creating, receiving, and otherwise processing computer files generated at or to be used at a business, such as e-mail, word-processing documents, photographs, and spreadsheets.

47

109.     From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachments B-1 and B-2 in computer hardware, computer software, smartphones, and storage media.

110.     Based on my knowledge and training and the experience of other agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in computer hardware, computer software or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer hardware, computer software, and storage media ("computer equipment") be seized and subsequently processed by a computer specialist in a laboratory setting rather than in the location where it is seized.  This is true because of:

a.     The volume of evidence — storage media such as hard disks, flash drives, CDs, and DVDs can store the equivalent of thousands or, in some instances, millions of pages of information.  Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names.  Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity.  This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on-site.

b.     Technical requirements — analyzing computer hardware, computer software or storage media for criminal evidence is a highly technical process requiring expertise and a properly controlled environment.  The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications.  Thus, it is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data.  Furthermore, data analysis protocols are exacting procedures, designed to protect the integrity of the evidence and to recover even "hidden," deleted, compressed, or encrypted files.  Many commercial computer software programs also save data in unique formats that are not conducive to standard data searches.  Additionally, computer evidence is extremely vulnerable to tampering or destruction, both from external sources and destructive code imbedded in the system as a "booby trap."

111.    The Target Locations may contain computer equipment whose use in the crime(s) or storage of the things described in this warrant is impractical to determine at the scene. Computer equipment and data can be disguised, mislabeled, or used without the owner's knowledge.  In addition, technical, time, safety, or other constraints can prevent definitive determination of their ownership at the premises during the execution of this warrant.  If the items described in Attachments B-1 and B-2 are of the type that might be found on any of the computer equipment, this application seeks permission to search and seize it off-site in order to determine their true use or contents, regardless of how the contents or ownership appear or are described by people at the scene of the search.

112.    Finally, I know that the commission of the offenses under investigation in the manner set forth above necessarily requires the use of computers, smartphones, tablets, or other computer devices and storage media for the perpetrator to access crypto-currency exchanges and wallets, connect with customers, and co-conspirators, and engage in transfers of digital currency. I have learned through training and experience that individuals who engage in the offenses under investigation in this way also commonly use such electronic devices to keep track of customers and co-conspirators, keep records of transactions and proceeds, and store copies of online chats, emails, and other data. In addition, I know, based on training and experience that perpetrators maintain copies of software programs and other applications including but not limited to crypto-currency client and wallet files, digital signature software and related authentication keys, as well as encryption software and related encryption keys.  In such cases, I know that perpetrators often keep such electronic devices inside their homes.  In the case of smartphones, tablets, and laptop computers, perpetrators may also keep such devices on their person, either in their pockets or in containers such as carrying bags, cases, backpacks, or protective sleeves.

113.    Based upon my training and experience, as well as my participation in this investigation, I believe that it is likely that the Target Locations will contain smartphones that can be unlocked via the use of a fingerprint in lieu of a numeric or alphanumeric password. As discussed above, I believe that LE is using an Apple iPhone. Therefore, I believe that the Target Locations likely contain Apple devices or other devices that can be unlocked with a fingerprint.

114.    I know from my training and experience, as well as from information found in publicly available materials including those published by Apple, that some models of Apple devices such as iPhones and iPads, offer their users the ability to unlock the device via the use of a fingerprint in lieu of a numeric or alphanumeric passcode or password. This feature is called Touch ID.

115.    If a user enables Touch ID on a given Apple device, he or she can register up to five fingerprints that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) at the bottom center of the front of the device. In my training and experience, users of Apple devices that offer Touch ID often enable it because it is considered to be a more convenient way to unlock the device than by entering a passcode, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

116.    In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6

days. Thus, in the event law enforcement encounters a locked Apple device, the opportunity to

unlock the device via Touch ID exists only for a short time. Touch ID also will not work to

unlock the device if (1) the device has been turned off or restarted; (2) the device has received a

remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are

made.

117.    The passcodes that would unlock these devices are not known to law

enforcement. Thus, it may be necessary to press the fingers of the users of the devices to the

device's Touch ID sensor in an attempt to unlock the device for the purpose of executing the

search authorized by this warrant. Attempting to unlock devices with the use of the fingerprints

of the users is necessary because the government may not otherwise be able to access the data

contained on those devices for the purpose of executing the search authorized by this warrant.

118.    Based on the facts discussed in this affidavit I believe that LE will be the primary

user of any mobile telephones or computer devices found at the Target Locations that were used

in furtherance of the Target Offenses. As such, I believe that LE's fingerprints will be among

those that are able to unlock the device via Touch ID. Accordingly, I request authority to place

LE's fingers on the Touch ID sensor to unlock any such seized devices.

### EVIDENCE RELATING TO THE TARGET OFFENSES IS ALSO LIKELY TO BE FOUND IN THE TARGET MAILBOXES

119.    The Rockland CMRA Mailbox is located at The UPS Store at 319 Centre Avenue

in Rockland, Massachusetts. According to business records obtained from The UPS Store,

Dajour Cox has been renting the Rockland CMRA Mailbox since approximately March 16,

2017.

120.    The Canton CMRA Mailbox is located at Postal Center USA at 18 Washington

Street in Canton Massachusetts. According to business records obtained from Postal Center

USA, LE, using the name "BL Productions," has been renting the Canton CMRA Mailbox since approximately November 13, 2018.

121.    The North Easton CMRA Mailbox is located at The UPS Store at 20 Roche Brother's Way, Unit 6, in North Easton, Massachusetts.  According to business records obtained from The UPS Store, Duane Freeman has been renting the North Easton CMRA Mailbox since approximately November 6, 2018.

122.    The North Easton Post Office Box is located at the North Easton, Massachusetts Post Office at 300 Main Street in North Easton, Massachusetts.  According to USPS records, Duane Freeman has been renting the North Easton Post Office Box since approximately November 13, 2018.

123.    As discussed above, agents have recovered from the trash at 1749 Central Street in Stoughton, Massachusetts, empty boxes and/or envelopes addressed to the Rockland CMRA Mailbox, the Canton CMRA Mailbox, the North Easton CMRA Mailbox, and the North Easton Post Office Box.  These empty boxes were often found with other evidence of drug manufacturing and distribution.  Additionally, as discussed above, parcels addressed to various locations, including the LE Residence, the Rockland CMRA Mailbox, the Canton CMRA Mailbox, the North Easton CMRA Mailbox, and the North Easton Post Office Box have been seized by law enforcement and found to contain controlled substances.

124.    Additionally, surveillance officers have observed LE go into the Postal Center USA where he rents the Canton CMRA Mailbox and exit carrying a cardboard box.  Surveillance officers have also observed LE go into CMRAs where he is not known to rent a private mailbox—such as The UPS Store at 319 Centre Avenue in Rockland, Massachusetts (where the Rockland CMRA Mailbox is located), and The UPS Store at 20 Roche Brother's Way in North

Easton, Massachusetts (where the North Easton CMRA is located)—and exit carrying packages. A short while later, LE was observed going into the Stoughton Location.

125.     Based upon my knowledge, training and experience, I know that individuals who are engaged in the illegal manufacture and distribution of controlled substances will often arrange to have parcels mailed in the name of other individuals in order to avoid detection by law enforcement should one of the parcels be intercepted.

126.     Accordingly, I request permission to search and seize any parcels or padded envelopes found at the Rockland CMRA Mailbox (as described in Attachment A-3), the Canton CMRA Mailbox (as described in Attachment A-4), the North Easton CMRA Mailbox (as described in Attachment A-5), and the North Easton Post Office Box (as described in Attachment A-6), and search any parcels or padded envelopes contained therein for evidence of the Target Offenses as set forth in Attachment B-3.

## CONCLUSION

127.     Based upon the evidence set forth above, as well as my training and experience, I submit that there is probable cause to believe that LE and others have committed and are continuing to commit the Target Offenses.  Based upon the evidence set forth above, as well as my knowledge, training and experience, I further submit that there is probable cause to believe that at the Stoughton Location described in Attachment A-1 and at the LE Residence described in Attachment A-2 there exists evidence, fruits, and instrumentalities of drug trafficking and money laundering activities in violation of the Target Offenses as set forth in Attachments B-1 and B-2, respectively.  Accordingly, I respectfully request that search warrants be issued for the searches of the premises described in Attachment A-1 and Attachment A-2 for the items detailed in Attachments B-1 and B-2, respectively.

128.    Additionally, based upon the evidence set forth above, as well as my knowledge, training and experience, I further submit that there is probable cause to believe that at the Rockland CMRA Mailbox described in Attachment A-3, the Canton CMRA Mailbox as described in Attachment A-4, the North Easton Mailbox as described in Attachment A-5, and the North Easton Post Office as described in Attachment A-6, there exists evidence, fruits, and instrumentalities of drug trafficking and money laundering activities in violation of the Target Offenses as set forth in Attachment B-3.   Accordingly, I respectfully request that search warrants be issued for the searches of the premises described in Attachments A-3, A-4, A-5, and A-6 for the items detailed in Attachment B-3.

129.    Disclosure of the contents of this affidavit and applications for and requested search warrants could compromise and jeopardize the ongoing investigation.  For that reason, I request that these documents all be sealed until further order of the Court.

Respectfully Submitted,

Gina Gentiluomo
Postal Inspector
U.S. Postal Inspection Service

Subscribed to and sworn before me on this
the 26th day of March 2019.

HON. JUDITH G. DEIN
United States Magistrate Judge
District of Massachusetts

54

## ATTACHMENT A-1

### (Description of Property to be Searched)

**1749 Central Street, Suite 3, Stoughton, Massachusetts ("The Stoughton Location"):**

The premises of 1749 Central Street, Suite 3, Stoughton, Massachusetts. This is a two-story multi-unit concrete and brick commercial building with a paved parking lot around the perimeter of the building with numerous parking spots. The building is on the right-hand side of Central Street if an individual is facing west. The front of the building contains two glass doors with the "1749" printed above the doors in white numerals. There is an interior staircase immediately past the glass doors. After proceeding up the staircase to the second floor and taking a left, Suite #3 is the first door on the left. (The only other door on the second floor on the left is the men's bathroom, which is identified by the word "MEN" printed on it.) Suite #3 can also be accessed from an exterior spiral staircase that leads to a glass door on the left outside of the building. This glass door leads directly into Suite 3.



## ATTACHMENT A-1 (continued)





## ATTACHMENT A-2

### (Description of Property to be Searched)

**285 Menlo Street, Brockton, Massachusetts ("The LE Residence"):**   The premises at 285 Menlo Street, Brockton, Massachusetts, which is the residence of Binh Le.  This is a two-story, single-family residence with white siding and pink shutters.  The residence is on the right-hand side of Menlo Street as an individual is facing west.  There is a paved driveway located to the front right of the residence that leads to a side deck.  There is a set of steps that leads to this deck and a side door to the residence that can be used to enter and exit the residence.  There is also a set of steps that lead to the front door of the residence.  The front door of the residence is white in color with a glass storm door attached to it.  The number "285" is clearly marked to the left of the front door in black numerals.



## ATTACHMENT A-2 (continued)



## ATTACHMENT A-3

### (Description of Property to be Searched)

**Private Mailbox #162 located at The UPS Store, 319 Centre Avenue, Rockland, Massachusetts ("The Rockland CMRA Mailbox"):**

The rented mailbox #162 located within The UPS Store at 319 Centre Avenue in Rockland, Massachusetts.

The UPS Store at 319 Centre Avenue in Rockland, Massachusetts is located within a one-story, L-shaped strip mall. There is a paved parking lot in the front of the building. This building is made of concrete and glass containing approximately ten businesses. The addresses for these businesses in this plaza range from #311-#347 Centre Avenue in Rockland, Massachusetts. The UPS store is located on the right-side of the building. The UPS Store is clearly marked with signage above the storefront and on the glass door, which serves as the entrance to The UPS Store.

## ATTACHMENT A-4

### (Description of Property to be Searched)

**Private Mailbox #234 located at Postal Center USA, 18 Washington Street, Canton, Massachusetts ("The Canton CMRA Mailbox"):**

The rented mailbox #234 located within Postal Center USA at 18 Washington Street in Canton, Massachusetts.

Postal Center USA is located in a one-story, L-shaped strip mall on Washington Street in Canton, Massachusetts. There is a paved parking lot in the front of the building. This building is made of brick and glass containing approximately ten (10) businesses. The addresses for these businesses in this plaza range from #4-#22 Washington Street. The Postal Center USA store is located on the right side of the building. The Postal Center USA store is clearly marked with signage above the storefront and on the glass door, which serves as the entrance to Postal Center USA.

## ATTACHMENT A-5

### (Description of Property to be Searched)

**Private Mailbox #384 located at 20 Roche Brother's Way, Unit 6, North Easton, Massachusetts ("The North Easton CMRA Mailbox"):**

The rented mailbox #384 located within The UPS Store at 20 Roche Brother's Way, Unit 6, in North Easton, Massachusetts.

The UPS Store at 20 Roche Brother's Way in North Easton, Massachusetts is located in a one-story strip mall on Roche Brother's Way. This building is made of brick and glass containing multiple businesses. The addresses for these businesses in this plaza are all within Easton Village located on Roche Brother's Way. There is a paved parking lot in the front of the building. The UPS Store is located on the left side of the plaza. The UPS Store is clearly marked with signage above the storefront and on the glass door, which serves as the entrance to The UPS Store.

## ATTACHMENT A-6

### (Description of Property to be Searched)

**Post Office Box 604 located at the North Easton, Massachusetts Post Office, 300 Main Street, North Easton, Massachusetts ("The North Easton Post Office Box"):**

The rented Post Office Box #604 located within the North Easton, Massachusetts Post Office at 300 Main Street in North Easton, Massachusetts.

The North Easton, Massachusetts Post Office at 300 Main Street in North Easton, Massachusetts is located in a one-story building made of brick and glass. There is a paved parking lot around the perimeter of the building. The United States Post Office is clearly marked with signage above the storefront and on the glass door, which serves as the entrance to the North Easton, Massachusetts Post Office.

**ATTACHMENT B-1**

**(Items to be Seized from 1749 Central Street, Suite 3, Stoughton, Massachusetts)**

I.      All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution and possession with intent to distribute controlled substances), 843(b) (use of a communication facility during or in relation to a controlled substances trafficking offense), and 846 (conspiracy to distribute and possess with intent to distribute controlled substances); and/or 18 U.S.C. §§ 1956, 1957 (money laundering offenses) (collectively, the "Target Offenses"), including:

A.      Controlled substances.

B.      Implements and materials used in connection with the processing, manufacture, production, storage, packaging, or dispensing of controlled substances such as pill presses; scales; funnels; sifters; grinders; raw materials or ingredients used as binders when making tablets containing controlled substances; postage; packaging materials; scales; plastic bags; plastic containers; cardboard boxes; mailing envelopes; packaging tapes; labels; label machines; vacuum- or heat-sealers; and Mylar packets.

C.      Records and tangible objects relating to the transportation, ordering, purchase, storage, and distribution of controlled substances or proceeds of controlled substances. Such records include ledgers; customer lists, dealer lists, and contact information for any of these customers or dealers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; money orders; wire transfers; vehicle rental receipts; credit card receipts; records and keys related to rental properties and/or storage units; records related to the rental of post office boxes or other locations where mail may be received, such as Commercial Mail Receiving Agency private mail boxes.

D.      Records and tangible objects pertaining to shipments of controlled substances, including air bills, labels for overnight deliveries and Express Mail deliveries, receipts and other documents pertaining to such shipments.

**ATTACHMENT B-1 (continued)**

E.    Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

F.    Virtual or digital or crypto-currency in any format, including but not limited to, wallets (digital and paper), public keys (addresses) and private keys, as well as documents, records, or information relating to the transfer, purchase, sale or disposition of such currency, including passwords for wallets used to store such currency.

G.    Cash, currency, and currency counting machines, and records relating to income derived from the sale of controlled substances and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records (including cashier's checks; checkbooks; passbooks; certificates of deposit).

H.    Records and tangible objects reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

I.    Records and tangible objects relating to email, online, or Dark Net accounts used to purchase, manufacture, or distribute controlled substances, including:

   i.    Records or tangible objects pertaining to the Dark Net vendor *EastSideHigh*.

   ii.   Other vendor names used to purchase, receive, store, manufacture, or distribute controlled substances in furtherance of the Target Offenses.

J.    Firearms and ammunition.

K.    Records and tangible objects pertaining to the travel or whereabouts of Binh Le between June 2018 and the date that this warrant is executed.

## ATTACHMENT B-1 (continued)

L.   Records and tangible objects pertaining to the existence, identity, and travel of any co-conspirators, as well as any co-conspirator's acts taken in furtherance of the crimes listed above.

M.   For any computer hardware, computer software, mobile phones, or storage media called for by this warrant or that might contain things otherwise called for by this warrant ("the computer equipment"):

   1.   evidence of who used, owned, or controlled the computer equipment;

   2.   evidence of the presence or absence of malicious software that would allow others to control the items, and evidence of the presence or absence of security software designed to detect malicious software;

   3.   evidence of the attachment of other computer hardware or storage media;

   4.   evidence of counter-forensic programs and associated data that are designed to eliminate data;

   5.   evidence of when the computer equipment was used;

   6.   passwords, encryption keys, and other access devices that may be necessary to access the computer equipment;

   7.   records and tangible objects pertaining to accounts held with companies providing Internet access or remote storage; and

N.   Records and tangible objects relating to the ownership, occupancy, or use of the premises to be searched (such as utility bills, phone bills, rent payments, mortgage payments, photographs, insurance documentation, receipts and check registers).

II.   All computer hardware, computer software, cellular telephones, and storage media.  Off-site searching of these items shall be limited to searching for the items described in paragraph I.

## ATTACHMENT B-1 (continued)

III.     During the execution of the search of the Subject Premises described in

Attachment A, law enforcement personnel are authorized to press the fingers (including thumbs)

of Binh Le to the Touch ID sensor of any Apple brand device(s), such as an iPhone or iPad,

found at the Subject Premises for the purpose of attempting to unlock the device(s) via Touch ID

in order to search the contents as authorized by this warrant.

### DEFINITIONS

For the purpose of this warrant:

A.     "Computer equipment" means any computer hardware, computer
software, mobile phone, storage media, and data.

B.     "Computer hardware" means any electronic device capable of data
processing (such as a computer, smartphone, mobile phone, or wireless
communication device); any peripheral input/output device (such as a
keyboard, printer, scanner, monitor, and drive intended for removable
storage media); any related communication device (such as a router,
wireless card, modem, cable, and any connections), and any security
device, (such as electronic data security hardware and physical locks and
keys).

C.     "Computer software" means any program, program code, information, or
data stored in any form (such as an operating system, application, utility,
communication and data security software; a log, history or backup file; an
encryption code; a user name; or a password), whether stored deliberately,
inadvertently, or automatically.

D.     "Storage media" means any media capable of collecting, storing,
retrieving, or transmitting data (such as a hard drive, CD, DVD, or
memory card).

E.     "Data" means all information stored on storage media of any form in any
storage format and for any purpose.

F.     "A record" is any communication, representation, information, or data.  A
"record" may be comprised of letters, numbers, pictures, sounds or
symbols.

66

### ATTACHMENT B-1 (continued)

### RETURN OF SEIZED COMPUTER EQUIPMENT

If the owner of the seized computer equipment requests that it be returned, the government will attempt to do so, under the terms set forth below. If, after inspecting the seized computer equipment, the government determines that some or all of this equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to retrieve and preserve as evidence, fruits or instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity (but not necessarily relevancy or admissibility) for evidentiary purposes.

If computer equipment cannot be returned, agents will make available to the computer system's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, or personally-identifying information of victims; or the fruits or instrumentalities of crime.

For purposes of authentication at trial, the Government is authorized to retain a digital copy of all computer equipment seized pursuant to this warrant for as long as is necessary for authentication purposes.

**ATTACHMENT B-2**

**(Items to be Seized from 285 Menlo Street, Brockton, Massachusetts)**

I.     All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution and possession with intent to distribute controlled substances), 843(b) (use of a communication facility during or in relation to a controlled substances trafficking offense), and 846 (conspiracy to distribute and possess with intent to distribute controlled substances); and/or 18 U.S.C. §§ 1956, 1957 (money laundering offenses) (collectively, the "Target Offenses"), including:

A.     Records and tangible objects relating to the transportation, ordering, purchase, storage, and distribution of controlled substances or proceeds of controlled substances.  Such records include ledgers; customer lists, dealer lists, and contact information for any of these customers or dealers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; money orders; wire transfers; vehicle rental receipts; credit card receipts; records and keys related to rental properties and/or storage units; records related to the rental of post office boxes or other locations where mail may be received, such as Commercial Mail Receiving Agency private mail boxes.

B.     Records and tangible objects pertaining to shipments of controlled substances, including air bills, labels for overnight deliveries and Express Mail deliveries, receipts and other documents pertaining to such shipments.

C.     Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

D.     Virtual or digital or crypto-currency in any format, including but not limited to, wallets (digital and paper), public keys (addresses) and private keys, as well as documents, records, or information relating to the transfer, purchase, sale or disposition of such currency, including passwords for wallets used to store such currency.

68

### ATTACHMENT B-2 (continued)

E.    Cash, currency, and currency counting machines, and records relating to income derived from the sale of controlled substances and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances.  Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records (including cashier's checks; checkbooks; passbooks; certificates of deposit).

F.    Records and tangible objects reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

G.    Records and tangible objects relating to email, online, or Dark Net accounts used to purchase, manufacture, or distribute controlled substances, including:

    i.    Records or tangible objects pertaining to the Dark Net vendor *EastSideHigh*.

    ii.    Other vendor names used to purchase, receive, store, manufacture, or distribute controlled substances in furtherance of the Target Offenses.

H.    Firearms and ammunition.

I.    Records and tangible objects pertaining to the travel or whereabouts of Binh Le between June 2018 and the date that this warrant is executed.

J.    Records and tangible objects pertaining to the existence, identity, and travel of any co-conspirators, as well as any co-conspirator's acts taken in furtherance of the crimes listed above.

K.    For any computer hardware, computer software, mobile phones, or storage media called for by this warrant or that might contain things otherwise called for by this warrant ("the computer equipment"):

    1.    evidence of who used, owned, or controlled the computer equipment;

## ATTACHMENT B-2 (continued)

2. evidence of the presence or absence of malicious software that would allow others to control the items, and evidence of the presence or absence of security software designed to detect malicious software;

3. evidence of the attachment of other computer hardware or storage media;

4. evidence of counter-forensic programs and associated data that are designed to eliminate data;

5. evidence of when the computer equipment was used;

6. passwords, encryption keys, and other access devices that may be necessary to access the computer equipment;

7. records and tangible objects pertaining to accounts held with companies providing Internet access or remote storage; and

L. Records and tangible objects relating to the ownership, occupancy, or use of the premises to be searched (such as utility bills, phone bills, rent payments, mortgage payments, photographs, insurance documentation, receipts and check registers).

II. All computer hardware, computer software, cellular telephones, and storage media. Off-site searching of these items shall be limited to searching for the items described in paragraph I.

III. During the execution of the search of the Subject Premises described in Attachment A, law enforcement personnel are authorized to press the fingers (including thumbs) of Binh Le to the Touch ID sensor of any Apple brand device(s), such as an iPhone or iPad, found at the Subject Premises for the purpose of attempting to unlock the device(s) via Touch ID in order to search the contents as authorized by this warrant.

## ATTACHMENT B-2 (continued)

## DEFINITIONS

For the purpose of this warrant:

A.    "Computer equipment" means any computer hardware, computer software, mobile phone, storage media, and data.

B.    "Computer hardware" means any electronic device capable of data processing (such as a computer, smartphone, mobile phone, or wireless communication device); any peripheral input/output device (such as a keyboard, printer, scanner, monitor, and drive intended for removable storage media); any related communication device (such as a router, wireless card, modem, cable, and any connections), and any security device, (such as electronic data security hardware and physical locks and keys).

C.    "Computer software" means any program, program code, information, or data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file; an encryption code; a user name; or a password), whether stored deliberately, inadvertently, or automatically.

D.    "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive, CD, DVD, or memory card).

E.    "Data" means all information stored on storage media of any form in any storage format and for any purpose.

F.    "A record" is any communication, representation, information, or data.  A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

## ATTACHMENT B-2 (continued)

### RETURN OF SEIZED COMPUTER EQUIPMENT

If the owner of the seized computer equipment requests that it be returned, the government will attempt to do so, under the terms set forth below.  If, after inspecting the seized computer equipment, the government determines that some or all of this equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to retrieve and preserve as evidence, fruits or instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity (but not necessarily relevancy or admissibility) for evidentiary purposes.

If computer equipment cannot be returned, agents will make available to the computer system's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, or personally-identifying information of victims; or the fruits or instrumentalities of crime.

For purposes of authentication at trial, the Government is authorized to retain a digital copy of all computer equipment seized pursuant to this warrant for as long as is necessary for authentication purposes.

**ATTACHMENT B-3**

**(Items to be Seized)**

All records, in whatever form, and tangible objects that constitute evidence, fruits, or

instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution and possession with intent

to distribute controlled substances), 843(b) (use of a communication facility during or in relation

to a controlled substances trafficking offense), and 846 (conspiracy to distribute and possess with

intent to distribute controlled substances); and/or 18 U.S.C. §§ 1956, 1957 (money laundering

offenses) (collectively, the "Target Offenses"), including:

1. Packages or Padded Envelopes containing:

   a. Controlled substances.

   b. Materials used in connection with the processing, manufacture,
      production, storage, packaging, or dispensing of controlled substances
      such as pill presses; scales; funnels; sifters; grinders; raw materials or
      ingredients used as binders when making tablets containing controlled
      substances;

   c. Records relating to controlled substances or the processing, manufacture,
      production, or production of controlled substances.

   d. Records relating to the identities of the individuals who shipped the
      package or the intended recipient of the package.

73